MARK C. RIFKIN
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile: 212/545-4677
rifkin@whafh.com

M. ANDERSON BERRY,
*pro hac vice forthcoming*
**CLAYEO C. ARNOLD,
A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
aberry@justice4you.com

RACHELE R. BYRD,
*pro hac vice forthcoming*
BRITTANY N. DEJONG,
*pro hac vice forthcoming*
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, California
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
dejong@whafh.com

*Counsel for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN HAJNY, individually, and on behalf of all others similarly situated, | Case No. _____ |
| *Plaintiff,* | Civil Action |
| v. | **CLASS ACTION COMPLAINT** |
| VOLKSWAGEN GROUP OF AMERICA, INC., AUDI OF AMERICA, LLC, and SANCTUS, LLC d/b/a SHIFT DIGITAL, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiff John Hajny ("Plaintiff"), on behalf of himself and all others similarly situated, upon personal knowledge of the facts pertaining to him and on information and belief as to all other matters, alleges the following against Defendants Volkswagen Group of America, Inc. ("VGoA"), Audi of America, LLC ("Audi"), and Sanctus, LLC d/b/a Shift Digital ("Shift Digital") (collectively, "Defendants").

## NATURE OF THE CASE

1.      Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard personally identifiable information that Plaintiff entrusted to Defendants.  Unfortunately, Defendants violated that trust, leaving Plaintiff and the putative Class to suffer the consequences.  Here, 3.3 million persons had their sensitive personally identifiable information ("PII")[1] stolen from Defendants by computer hackers in a cyber-attack (the "Data Breach"). The information compromised in the Data Breach includes name, mailing address,

---

[1]      PII generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII is also generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

email address, phone number, information about a vehicle purchased, leased, or inquired about including the Vehicle Identification Number ("VIN"), make, model, year, color, and trim and, in some instances, buyers' or interested parties' driver's license numbers, Social Security numbers, account or loan numbers, and tax identification numbers.[2]

2.     A memo to VGoA dealers identified Shift Digital as being involved in the Data Breach impacting more than 3.3 million customers and prospective buyers, primarily at Audi.  Shift Digital is used by Audi, Volkswagen, and some authorized dealers in the United States and Canada.  According to VGoA, Shift Digital left unsecured an electronic file containing PII, gathered for sales and marketing between 2014 and 2019.[3]

3.     Plaintiff Hajny brings this class action lawsuit on behalf of a Nationwide Class and a California Sub-Class (together, the "Class") to address Defendants' inadequate safeguarding of class members' Sensitive Information.

4.     Armed with the Sensitive Information accessed in the Data Breach, data thieves can  commit numerous crimes including opening new financial

---

[2]     *See* https://oag.ca.gov/system/files/Audi%20Notification%20Letter%20Template.pdf (last visited July 6, 2021).

[3]     *See* Larry P. Vellequette, *Vendor linked to VW data breach named in memo to dealers*, AUTOMOTIVE NEWS (June 11, 2021), https://www.autonews.com/technology/vendor-linked-vw-data-breach-named-memo-dealers (last visited July 6, 2021).

accounts in Class members' names, taking out loans in Class members' names, using Class members' names to obtain medical services, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, obtaining driver's licenses in Class members' names but with another person's photograph, and giving false information to police during an arrest.

5.      Indeed, new outlets are already reporting that the information stolen in the Data Breach is being sold on well-known hacking forums.[4] This shows the clear value of the stolen data to identity thieves and the imminent peril faced by Plaintiff and the members of the Class.

6.      As a result of the Data Breach, Plaintiff and Class members have been exposed to a heightened and imminent risk of fraud and identity theft.  Plaintiff and Class members must nowand in the future closely monitor their financial accounts to guard against identity theft.

7.      Plaintiff and Class members will also incur out-of-pocket costs for

---

[4]      *See, e.g.*, Lorenzo Fracheschi-Bicchierai, *Hackers Are Selling Data Stolen From Audi and Volkswagen*, MOTHERBOARD, TECH BY VICE (June 17, 2021), https://www.vice.com/en/article/xgxaq4/hackers-are-selling-data-stolen-from-audi-and-volkswagen (last visited July 6, 2021); Lawrence Abrams, *Audi, Volkswagen customer data being sold on hacking forum*, BLEEPING COMPUTER (June 17, 2021), https://www.bleepingcomputer.com/news/security/audi-volkswagen-customer-data-being-sold-on-a-hacking-forum/ (last visited July 6, 2021).

things such as paying for credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

8.    Plaintiff seeks to remedy these harms on behalf of himself and all similarly-situated individuals whose PII was accessed during the Data Breach.

9.    Plaintiff and the Class request remedies including damages, reimbursement of out-of-pocket costs, and equitable and injunctive relief, including improvements to Defendants' data security systems, future annual audits, and ID protection services funded by Defendants.

## PARTIES

10.    Plaintiff John Hajny is resident of the state of California. He has leased at least six Audi vehicles since 2014 from various California Audi dealerships.  Mr. Hajny received a Notice of Security Incident from Defendants on or about June 15, 2021.

11.    Defendant Volkswagen Group of America, Inc. ("VGoA") is a corporation incorporated in New Jersey with its principal place of business in Herndon, Virginia. Defendant VGoA is the North American subsidiary of Volkswagen AG.

12.    Defendant Audi of America, LLC ("Audi") is a registered trade name of VGoA and has its principal place of business in Herndon, Virginia.

13.    Defendant Sanctus, LLC d/b/a Shift Digital ("Shift Digital") is a

Michigan limited liability company headquartered in Birmingham, Michigan. Shift Digital claims it is "the leader in digital marketing program optimization."[5]

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5 million exclusive of interest and costs, and many members of the class are citizens of states different from Defendants.

15.     This Court has personal jurisdiction over Defendants because Defendants conduct business in and throughout New Jersey, and the wrongful acts alleged in this Complaint were committed in New Jersey, among other venues.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendant VGoA is incorporated in this District and all defendants regularly transact business here. Further, venue is proper under 28 U.S.C. § 1391(b)(3) because all Defendants are subject to personal jurisdiction in this District.

---

[5]     https://www.shiftdigital.com/company/ (last visited July 6, 2021).

## FACTUAL ALLEGATIONS

17.    Defendants VGoA and Audi sell and market Volkswagen and Audi vehicles in the United States. Defendant Shift Digital helps deploy and manage marketing programs; its technology was initially developed to meet the needs of the automotive industry and has more recently evolved to serve clients in other industries such as powersports, home building, and healthcare.  As a part of the automobile sales and marketing process, Defendants collect various types of PII from customers and potential customers, including name, mailing address, email address, phone number, and information about a vehicle purchased, leased, or inquired about including the VIN, make, model, year, color, and trim.  In the event the buyer or potential buyer purchases the vehicle or applies to Defendants for financing, Defendants also collect the buyers' or interested parties' driver's license numbers, Social Security numbers, account or loan numbers, and tax identification numbers.

18.    In addition to storing this information themselves, Defendants also provide it to third party vendors for sales and marketing purposes.

19.    From 2014 through 2019, Defendants collected the PII of approximately 3.3 million U.S.-based customers. Roughly 90,000 of those customers provided their driver's license numbers, Social Security numbers, account or loan numbers, or tax identification numbers.

7

20.     While Defendants are more than happy to monetize that information, and despite the very sensitive nature of that information and the clear potential for misuse, Defendants left that data stored unsecured for *two years*.

21.     In early March 2021, Defendants were informed that unauthorized third parties had gained access to this PII. Following an investigation, in May 2021, Defendants confirmed the PII was unsecured and that it had been stolen by cyberthieves.

22.     On or about June 11, 2021, Defendants began notifying affected customers and state attorneys general about the breach and data theft.

23.     Just a few days later, the information stolen in the Data Breach showed up for sale on well-known hacking forums.[6]

24.     To lease his Audi vehicles, Plaintiff Hajny was required by Defendants to provide his PII, including his full name, driver's license number, Social Security number, e-mail address, telephone numbers, date of birth, bank account numbers, and other sensitive information, including employer name, names and contact information of relatives and personal references, and insurance information. He provided this PII to Defendants with the understanding that his PII would be protected, maintained, and safeguarded from unauthorized use or disclosure, and that he would be timely notified of any unauthorized disclosure of his PII. He would not

---

[6]     *Id*.

have agreed to provide his PII to Defendants, or would have taken precautions to protect it had he known that Defendants would not safeguard it.

25.    Plaintiff Hajny received Defendants VGoA's and Audi's Notice of Data Security Incident, dated June 15, 2021, on or about that date.

26.    The Notice instructed Mr. Hajny to, among other things, "[l]ook out for spam emails" and "[b]e cautious when opening links or attachments from unsolicited third parties."

27.    On or about May 24, 2021, Plaintiff Hajny was informed by the Internal Revenue Service ("IRS") that unauthorized third parties used his name and PII to electronically file a fraudulent 2019 tax return in his name.  Because of this fraud, the IRS believes Mr. Hajny owes the government approximately $5,000.  The IRS also informed Mr. Hajny that a different unauthorized third party electronically filed a 2020 tax return in his name, but because that return was filed after Mr. Hajny filed his hard copy 2020 tax return, the fraud is pending investigation.

28.    After receipt of the Notice letter, Plaintiff Hajny made reasonable efforts to mitigate further impact of the Data Breach.  He spent time researching the Data Breach, reviewing and monitoring his credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.  In response to the IRS fraud he suffers as a consequence of the Data Breach, Mr. Hajny has spent time online and on the telephone with various IRS departments, he filed a

police report with the local police department, and he personally drove to the IRS office in Alameda County to dispute the fraudulent tax return filings in person. He estimates that he has spent 10-15 hours in response to the Data Breach so far. This is valuable time he otherwise would have spent on other activities.

29.    Plaintiff Hajny suffered additional actual injury from having his PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that Defendants obtained from Plaintiff; (b) violation of his privacy rights; and (c) further imminent and impending injury arising from the increased risk of identity theft and fraud.

**A.    The PII exposed by Defendants is very valuable to identity thieves**

30.    The information exposed by Defendants is very valuable to phishers, hackers, identity thieves and cyber criminals, especially at this time where unprecedented numbers of fraudsters are filing fraudulent unemployment benefit claims.

31.    Cybercrime has been on the rise for the past decade and continues to climb exponentially; as of 2013 it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[7]

32.    Stolen PII is often trafficked on the "dark web," a heavily encrypted

---

[7]    Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013).

part of the Internet that is not accessible via traditional search engines. This is because malicious actors buy and sell that information for profit.[8] And, indeed, it appears this is already happening with the PII stolen in the Data Breach here.

33.    Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

34.    For example, when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity.   Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data disclosures in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[9]

---

[8]    Donna Parent, *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited July 6, 2021).
[9]    *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited July 6, 2021).

35.    Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[10]  Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[11]  Criminals can also purchase access to entire company data breaches for $900 to $4,500.[12]

36.    The information compromised in the Data Breach here is significantly more valuable than the loss of, for example, credit card information because there victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—names, dates of birth, driver's license numbers and Social Security numbers, etc.—is difficult, if not impossible, to change.

37.    Social Security numbers are among the worst kind of personal information to have stolen because they can be misused so many different ways and are very difficult to change. The Social Security Administration stresses that the loss

---

[10]    Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited July 6, 2021).

[11]    Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web,* EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 6, 2021).

[12]    *In the Dark,* VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 6, 2021).

of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[13]

38.    And it is no easy task to change or cancel a stolen Social Security number. Plaintiff and the Class members cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

39.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[14]

---

[13]    Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 6, 2021).

[14]    Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to*

40.    Driver's license numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[15]

41.    National credit reporting company, Experian, blogger Sue Poremba also emphasized the value of a driver's license to thieves and cautioned:

> If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you.  Next to your Social Security number, your driver's license is one of the most important pieces to keep safe from thieves.[16]

42.    In fact, according to CPO Magazine, which specializes in news, insights and resources for data protection, privacy and cyber security professionals, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like

---

*Bounce          Back*,          NPR          (Feb.          9,          2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited July 6 2021).

[15]    Lee Mathews, *Hackers Stole Customers' License Numbers from Geico in Months-Long          Breach*,          FORBES          (April          20,          2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3066c2218658          (last visited July 6, 2021).

[16]    Sue Poremba*, What Should I do If My Driver's License Number Is Stolen?*, EXPERIAN (Oct. 24, 2018), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited July 6, 2021).

a relatively harmless piece of information to lose if it happens in isolation."[17]  Tim Sadler, CEO of email security firm Tessian, told CPO Magazine why this is not the case and why these numbers are very much sought after by cyber criminals:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks . . . .  [B]ad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as unemployment numbers continue to soar. . . .  In other cases, a scam using these driver's license numbers could look like an email that impersonates the DMV, requesting the person verify their driver's license number, car registration or insurance information, and then inserting a malicious link or attachment into the email.[18]

43.    Drivers' license numbers have been taken from auto-insurance providers by hackers in other circumstances, indicating both that this particular form of PII is in high demand and also that Defendants knew or had reason to know that their security practices were of particular importance to safeguard consumer data.[19]

---

[17]    Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPOMAGAZINE (April 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited July 6, 2021).

[18]    *Id*.

[19]    *See* United States Securities and Exchange Commission Form 8-K for INSU Acquisition Corp. II (Feb. 1, 2021), https://www.sec.gov/Archives/edgar/data/1819035/000121390021005784/ea134248-8k_insuacquis2.htm?=1819035-01022021 (last visited July 6, 2021) (announcing a merger with auto-insurance company MetroMile, Inc., an auto-insurer, which announced a drivers' license number Data Disclosure on January 19, 2021); Ron Lieber, *How Identity Thieves Took My Wife for a Ride*, N.Y. TIMES

44.    The data stolen in this case commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x in price on the black market."[20]

45.    Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details.  This can lead to additional PI being harvested from the victim, as well as PI from family, friends, and colleagues of the original victim.

46.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

47.    Victims of driver's license number theft also often suffer unemployment benefit fraud, harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing

_____

(Apr. 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited July 6, 2021) (describing a scam involving drivers' license numbers and Progressive Insurance).

[20]    Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited July 6, 2021).

accounts.

**B.  Defendants failed to comply with Federal Trade Commission requirements for data security**

48.    Federal and State governments have established security standards and issued recommendations to minimize data disclosures and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[21]

49.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for businesses.[22] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity

---

[21]    *See* Federal Trade Commission, *Start With Security: A Guide for Business* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 7, 2021).

[22]    *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 7, 2021).

indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

50.    Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[24]

51.    Highlighting the importance of protecting against data disclosures, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[25]

52.    Through their negligence in securing Plaintiff's and Class members' PII, Defendants failed to employ reasonable and appropriate measures to protect

---

[23]    *Id.*

[24]    Federal Trade Commission, *Start With Security, supra* fn. 20.

[25]    Federal Trade Commission, *Privacy and Security Enforcement Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited July 7, 2021).

against unauthorized access to Plaintiff's and the Class members' PII. Defendants' data security policies and practices constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, in addition to violation of the Drivers' Privacy Protection Act, 18 U.S.C. § 2724 ("DPPA").

**C.    Plaintiff and the Class members suffered damages as a result of Defendants' failure to protect their PII**

53.    Plaintiff and Class members are at risk for actual identity theft in addition to all other forms of fraud.

54.    The ramifications of Defendants' failure to keep individuals' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.[26]

55.    The PII belonging to Plaintiff and Class members is private and sensitive in nature.  Defendants failed to obtain Plaintiff's and Class members' consent to disclose such PII to any other person as required by applicable law and industry standards.

56.    Defendants' inattention to the possibility that anyone could obtain the PII of any customer or potential customer of Defendants left Plaintiff and Class members with no ability to protect their sensitive and private information.

---

[26]    *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (August 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf   (last visited July 7, 2021).

57.     Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligations to protect PII of the Plaintiff and Class members from unauthorized disclosure.

58.     Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into their systems and, ultimately, the theft of PII.

59.     As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

60.     The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[27]

61.     As a result of Defendants' failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

---

[27]     U.S. Department of Justice, OFFICE OF JUSTICE PROGRAMS BUREAU OF JUSTICE STATISTICS, *Victims of Identity Theft, 2012*, December 2013, https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited July 7, 2021).

a.   The compromise, publication, theft, and/or unauthorized use of their PII;

b.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

c.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

d.   The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the PII in their possession; and

e.   Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members.

62.    In addition to a remedy for the economic harm, Plaintiff and the Class members maintain an undeniable interest in ensuring that their PII is secure, remains

secure, and is not subject to further misappropriation and theft. Plaintiff therefore requests the injunctive remedies outlined in the Prayer of this Complaint.

63.    Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of the following national class ("Nationwide Class"):

> All persons residing in the United States whose PII, as defined herein, was compromised in the Data Breach that Defendants VGoA and Audi announced in June 2021.

64.    Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of the following California state subclass ("California Subclass"):

> All persons residing in the State of California whose PII, as defined herein, was compromised in the Data Breach that Defendants VGoA and Audi announced in June 2021.

65.    The Nationwide Class and California Subclass are collectively referred to herein as the "Class" unless otherwise stated.

66.    Excluded from the proposed Class are the Defendants, including their corporate affiliates and any entities in which they have a controlling interest or that are controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants.

67.    Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division, or create and seek certification of additional classes, after having had an opportunity to conduct discovery.

68. **Numerosity.**    Although the exact number of Class members is uncertain, Defendants have reported it to be around 3.3 million people. This number is clearly great enough that joinder is impracticable. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. The Class members may be identified by objective means, such as through information and records in Defendants' possession, custody, or control.

69. **Commonality and Predominance.**  Common questions of law and fact exist as to the proposed Class members and predominate over questions affecting only individual Class members.  These common questions include:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether Defendants' data security measures to protect Plaintiff's and Class members' PII were reasonable in light of industry standards, the sensitivity of the information involved, the known threats to PII, the FTC data security recommendations, applicable cybersecurity standards, and best practices recommended by data security experts;

c. Whether Defendants violated the California state laws identified herein;

d.      Whether Defendants' failure to implement adequate data security measures resulted in or was the proximate cause of the Data Breach;

e.      Whether Defendants' conduct, including their failure to act, was a legal cause of the loss of PII of Plaintiff and Class members;

f.      Whether Defendants owed a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, and safeguarding their PII;

g.      Whether Defendants negligently or recklessly breached legal duties owed to Plaintiff and the other Class members to exercise due care in collecting, storing, and safeguarding their PII;

h.      Whether Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

i.      Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

70.     **Typicality**.  Plaintiff's claims are typical of the claims of the Class members. All Class members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties.

71.    **Adequacy Of Representation.**  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

72.    **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT 1
### Negligence
### (On behalf of the Nationwide Class and the California Subclass)

73.    Plaintiff incorporates by reference all allegations in paragraphs 1 through 72 as though fully set forth herein.

74.    Plaintiff brings this claim against Defendants on behalf of himself, the Nationwide Class, and the California Subclass.

75.    Defendants owed a duty to Plaintiff and the Class to exercise reasonable care in securing, safeguarding, storing, and protecting Plaintiff's and Class members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing their data security systems to ensure that Plaintiff's and Class members' PII in Defendants' possession was and is adequately secured and protected. Defendants also owe a duty to ensure that they have adequate intrusion detection systems so that they can timely detect intrusions into their systems and networks and can take appropriate corrective action.

76.    Additionally, Defendants owe a duty to confirm that any affiliates, vendors, or third parties whom Defendants are entrusting to manage, store, and secure the PII provided to Defendants by their customers have adequate security for that PII, follow industry standards and laws relating to safeguarding PII, have properly segregated that PII, have securely encrypted that PII, and otherwise

26

prioritize data security in a way that will ensure the PII is secure from cyber threats and malicious actors.

77.    Defendants owed a duty of care to Plaintiff and members of the Class because they were foreseeable and probable victims of any inadequate data security practices. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and Class members and the critical importance of adequately securing such information.

78.    Plaintiff and members of the Class entrusted Defendants with their PII with the understanding that Defendants would safeguard their information. Defendants were in a position to protect against the harm suffered by Plaintiff and members of the Class as a result of the Data Breach whereas Plaintiff and the Class members were dependent on Defendants for that protection.

79.    Defendants' actions created a foreseeable risk of harm to Plaintiff and Class members. Defendants' misconduct included failing to implement the systems, policies, and procedures necessary to prevent the Data Breach, failing to properly encrypt the PII, failing to implement systems that could timely detect intrusions into their systems by threat actors, failing to train their personnel to recognize and respond to data security risks, or failing to ensure that parties entrusted by Defendants to store, manage, and secure the PII of Plaintiff and the Class had those systems and procedures in place.

80.    Defendants knew, or should have known, of the risks inherent in collecting and storing PII and the importance of adequate security. Defendants knew about – or should have been aware of - numerous, well-publicized data breaches affecting businesses that store PII in the United States.

81.    Defendants also had independent duties under state and federal laws that required Defendants to reasonably safeguard Plaintiff's and Class members' PII. These duties are non-delegable.

82.    Defendants breached their duties to Plaintiff and Class members by failing to provide reasonable or adequate computer systems and data security to safeguard the PII of Plaintiff and Class members.

83.    Furthermore, Defendants negligently entrusted Plaintiff's and the Class members' PII to third party vendors and service providers without taking adequate steps to ensure they had the systems and protocols in place to protect that PII from theft or disclosure.

84.    Through Defendants' acts and omissions, including Defendants' failure to provide adequate security and its failure to protect Plaintiff's and Class members' PII from being foreseeably accessed, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure the PII of Plaintiff and Class members.

85.    In engaging in the negligent acts and omissions as alleged herein, which permitted an unknown third party to exfiltrate Plaintiff's and Class members' PII and then misuse it, Defendants violated Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce." This prohibition includes failing to have adequate data security measures and failing to protect Plaintiff's and Class members' PII. Defendants also violated the Drivers' Privacy Protection Act, 18 U.S.C. § 2724 ("DPPA"), in that they disclosed the driver's license numbers of Plaintiff and the Class members to unauthorized third parties.

86.    Plaintiff and the Class members are among the class of persons Section 5 of the FTC Act and the DPPA were designed to protect, and the injuries suffered by Plaintiff and the Class members is the type of injury those laws were intended to prevent.

87.    Neither Plaintiff nor any of the Class members contributed to the Data Breach as described in this Complaint.

88.    As a direct and proximate cause of Defendants' negligent conduct, Plaintiff and Class members have suffered and/or will suffer injury and damages, including: (i) actual instances of identity fraud or similar misuse of their PII; (ii) loss of their benefit of the bargain with Defendants; (iii) the publication, theft, or misuse of their PII, including instances of identity fraud or similar misconduct; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery

from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (viii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect that PII in their continued possession; and, (ix) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives.

## COUNT 2
**Unjust Enrichment**
**(On behalf of the Nationwide Class and the California Subclass)**

89.    Plaintiff incorporates by reference the allegations from paragraphs 1 through 72 as though fully set forth herein.

90.    Plaintiff brings this claim against Defendants on behalf of himself, the Nationwide Class, and the California Subclass.

91.    Plaintiff and members of the Class conferred a monetary benefit on Defendants.  Specifically, Plaintiff and Class members paid for products or services of the Defendants and also provided and entrusted their PII to those Defendants, which Defendants used for sales and marketing purposes.

92.    In exchange, Plaintiff and Class members should have received from Defendants their expected goods and services, such as the security of their PII, and should have been entitled to have Defendants protect their PII with adequate data security.

93.    Defendants appreciated, accepted, and retained the benefits bestowed on them under inequitable and unjust circumstances arising from Defendants' conduct toward Plaintiff and Class members as described herein; Plaintiff and Class members conferred a benefit on Defendants; and Defendants accepted or retained that benefit. Defendants profited from the products and services Plaintiff and Class members paid for and they used Plaintiff's and Class members' PII for business purposes.

94.    Defendants failed to secure Plaintiff's and Class members' PII and, therefore, did not provide full compensation for the monetary benefit Plaintiff and Class members conferred on Defendants.

95.    Defendants acquired the PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

96.     Had Plaintiff and Class members known that Defendants would not secure their PII using adequate security, they would not have chosen to use Defendants' products or services, or would have paid less for them, and would not have entrusted their PII to Defendants.

97.     Plaintiff and Class members have no adequate remedy at law.

98.     Under these circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class members conferred on them.

99.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the money or items of value belonging to Plaintiff and Class.

**COUNT 3**
**Breach of Confidence**
**(On behalf of the Nationwide Class and the California Subclass)**

100.    Plaintiff incorporates by reference the allegations from paragraphs 1 through 72 as though fully set forth herein.

101.    Plaintiff brings this claim against Defendants on behalf of himself, the Nationwide Class, and the California Subclass.

102.    At all times during Plaintiff's and Class members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of

Plaintiff's and Class members' PII that Plaintiff and Class members provided to Defendants.

103.  Defendants' relationship with Plaintiff and Class members was governed by terms and expectations that Plaintiff's and Class members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

104.  Plaintiff and Class members provided their PII to Defendants with the explicit and implicit understanding that Defendants would protect and not permit the PII to be disseminated to any unauthorized parties.

105.  Defendants voluntarily received in confidence Plaintiff's and Class members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

106.  Due to Defendants' failure to prevent, detect, and avoid the Data Breach by following best information security practices to secure Plaintiff's and Class members' PII, Plaintiff's and Class members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class members' confidence, and without their express permission.

107.  As a direct and proximate cause of Defendants' actions and omissions, Plaintiff and Class members have suffered the damages alleged.

108.   But for Defendants' disclosure of Plaintiff's and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and misused by unauthorized third parties. Defendants' disclosure through the Data Breach was the direct and legal cause of the theft of Plaintiff's and Class members' PII, as well as the resulting damages.

109.   The injury and harm Plaintiff and Class members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiff's and Class members' PII. Defendants knew their systems and technologies for accepting and securing Plaintiff's and Class members' PII had numerous security and other vulnerabilities that placed Plaintiff's and Class members' PII in jeopardy.

110.   As a direct and proximate result of Defendants' breaches of confidence, Plaintiff and Class members have suffered and will suffer injury, including but not limited to:  (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as

Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

**COUNT 4**
**Breach of Implied Contract**
**(On behalf of the Nationwide Class and the California Subclass)**
**(Against Defendants VGoA and Audi)**

111.    Plaintiff incorporates by reference Paragraphs 1 through 72 as though fully set forth herein.

112.    Plaintiff brings this claim against Defendants VGoA and Audi on behalf of himself, the Nationwide Class, and the California Subclass.

113.    Defendants provided automobile products and services to Plaintiff and Class members in exchange for compensation and other benefits. In so doing, Defendants either required Plaintiff and Class members to provide their PII or acquired their PII with the authorization of Plaintiff and the Class members.

114.    Implied in these exchanges was a promise by Defendants to ensure that the PII of Plaintiff and Class members in their possession was only used to provide the agreed-upon services and other benefits from Defendants.

115.    Defendants were therefore required to reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosure or use.

116.    Plaintiff and Class members accepted Defendants' offers for products

and services and fully performed their obligations under the implied contract with Defendants by providing their PII, directly or indirectly, to Defendants.

117.    Plaintiff and Class members would not have provided and entrusted their PII to Defendants in the absence of their implied contracts with Defendants, and would have instead retained the opportunity to control their PII for uses other than products and services from Defendants.

118.    Defendants breached their implied contracts with Plaintiff and Class members by failing to reasonably safeguard and protect Plaintiff's and Class members' PII.

119.    As a proximate and direct result of Defendants' breaches of its implied contracts with Plaintiff and Class members, Plaintiff and the Class members suffered economic damages as described in detail above.

**COUNT 5**
**Declaratory and Injunctive Relief**
**(On behalf of the Nationwide Class and all Subclasses)**

120.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

121.    Plaintiff brings this claim against Defendants on behalf of himself, the Nationwide Class, and the California Subclass.

122.   As previously alleged, Defendants owe duties of care to Plaintiff and Class members that require Defendants to adequately secure the PII entrusted to them.

123.   Defendants still possesses the PII pertaining to Plaintiff and the Class members.

124.   Defendants have made no announcement or notification that they have remedied the vulnerabilities in their practices and policies about ensuring the data security of Plaintiff's and the Class members' PII.

125.   Accordingly, Defendants have not satisfied their legal obligations and duties to Plaintiff and the Class members. On the contrary, now that Defendants' lax approach towards data security has become public, the PII in their possession is more vulnerable than it was prior to announcement of the Data Breach.

126.   Actual harm has arisen in the wake of the Data Breach regarding Defendants' obligations and duties of care to provide data security measures to Plaintiff and the Class members, including the fact that Class members' PII is potentially available for sale on the dark web.

127.   Plaintiff therefore seeks a declaration that Defendants' existing data security measures do not comply with their obligations and duties of care, and to comply with their obligations and duties of care, Defendants must implement and maintain reasonable security measures, including those set forth in the prayer below.

## COUNT 6
### Violation of the Drivers' Privacy Protection Act, 18 U.S.C. § 2724
### (On behalf of the Nationwide Class and California Subclass)

128.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

129.    Plaintiff brings this claim against Defendants on behalf of himself, the Nationwide Class, and the California Subclass.

130.    The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." 18 U.S.C. § 2724.

131.    Under the DPPA, a "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(a).  Drivers' license numbers are motor vehicle records under the DPPA.

132.    Defendants obtain motor vehicle records from their customers.

133.    Defendants also obtain motor vehicle records directly from companies and entities that provide such records.

134.    From 2019 through 2021, PII of Plaintiff and the Class, including their drivers' license numbers, were left unsecured and publicly available on Defendants'

systems. Defendants thus knowingly both used and disclosed Plaintiff's and Class members' motor vehicle records for a purpose not permitted by the DPPA pursuant to 18 U.S.C. §§ 2724 and 2721(b).

135.    Through the Data Breach, Defendants disclosed motor vehicle records for purposes not authorized by the DPPA.

136.    Plaintiff and Class members are entitled to actual damages, liquidated damages, and attorneys' fees and costs.

**COUNT 7**
**Violation of California's Consumer Privacy Act,**
**Cal. Civ. Code § 1798.150**
**(On behalf of the California Subclass only)**

137.    Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

138.    Plaintiff brings this claim against Defendants on behalf of himself and the California Subclass.

139.    Defendants are corporations organized for the profit or financial benefit of their owners and have annual gross revenues exceeding $25 million and collect PII as defined in Cal. Civ. Code § 1798.140.  In addition, Defendants annually buy, receive, sell, or share for commercial purposes the PII of more than 50,000 consumers.

140.    Defendants violated section 1798.150(a) of the California Consumer Privacy Act by failing to implement and maintain reasonable security procedures

and practices appropriate to the nature of the information to protect the PII of Plaintiff and the California Subclass. As a direct and legal result, Plaintiff's and the California Subclass's PII was subject to unauthorized access and exfiltration, theft, or disclosure.

141.   As a direct and proximate result of Defendant's acts, Plaintiff and the Class members were injured and lost money or property, including the loss of benefit of the bargain, the loss of their legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

142.   Plaintiff and Class members seek injunctive or other equitable relief to ensure Defendants hereinafter adequately safeguard Plaintiff's and the California Subclass members' PII by implementing reasonable security procedures and practices.  Such relief is particularly important because Defendants continue to hold Plaintiff's and California Subclass members' PII.  These individuals have an interest in ensuring that their PII is reasonably protected.

143.   Contemporaneously with filing this Complaint, and on or about July 8, 2021, Plaintiff sent Defendants via certified mail the 30-day notice letter as required under Civil Code section 1798.150(b). Plaintiff and the California Subclass members reserve the right to amend this Complaint as of right to seek statutory damages and relief following the expiration of the 30-day period.

## COUNT 8
### Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code § 17200, *et seq.*—Unlawful Business Practices
### (On behalf of the California Subclass only)

144.   Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

145.   Plaintiff brings this claim against Defendants on behalf of himself and the California Subclass.

146.   Defendants have violated Cal. Bus. and Prof. Code § 17200, *et seq.*, by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Class.

147.   Defendants engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting the PII of Plaintiff and the California Subclass with knowledge that the information would not be adequately protected; and by storing the PII of Plaintiff and the California Subclass in an unsecure environment in violation of the DPPA, 18 U.S.C. § 2724, and Section 5 of the FTC Act, 15 U.S.C. § 45, which requires Defendants to employ reasonable methods of safeguarding the PII of Plaintiff and the California Subclass.

41

148.  As a direct and proximate result of Defendants' unlawful practices and acts, Plaintiff and the California Subclass were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Plaintiff's and the California Subclass' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

149.  Defendants knew or should have known that their data security practices were inadequate to safeguard the PII of Plaintiff and the California Subclass and that the risk of a data breach or theft was highly likely, especially given its inability to adhere to basic encryption standards and data disposal methodologies. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the California Subclass.

150.  Plaintiff and the California Subclass seek relief under Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, restitution to Plaintiff and the California Subclass of money or property that Defendants may have acquired by means of their unlawful and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorneys' fees and costs, and injunctive or other equitable relief.

## COUNT 9
### Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code § 17200, *et seq.*—Unfair Business Practices
### (On behalf of the California Subclass only)

151.   Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

152.   Plaintiff brings this claim against Defendants on behalf of himself and the California Subclass.

153.   Defendants engaged in unfair acts and practices with respect to the services they provide by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting the PII Plaintiff and the California Subclass with knowledge that the information would not be adequately protected; and by storing the PII Plaintiff and the California Subclass in an unsecure electronic environment.  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the California Class.  They were likely to deceive the public into believing their PII was securely stored, when it was not.  The harm these practices caused to Plaintiff and the California Subclass outweighed their utility, if any.

154.   Defendants engaged in unfair acts and practices with respect to the provision of services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the PII of Plaintiff and the California Subclass from further unauthorized disclosure, release, data breaches, and

theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the California Subclass. They were likely to deceive the public into believing their PII were securely stored when they were not. The harm these practices caused to Plaintiff and the California Subclass outweighed their utility, if any.

155. As a direct and proximate result of Defendants' acts of unfair practices, Plaintiff and the California Subclass were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Plaintiff's and the California Subclass' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

156. Defendants knew or should have known that their data security practices were inadequate to safeguard the PII of Plaintiff and the California Subclass and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the California Subclass.

157. Plaintiff and the California Subclass seek relief under Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, restitution to Plaintiff and the California Subclass of money or property that the Defendants may have acquired by

means of their unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of their unfair business practices, declaratory relief, attorneys' fees and costs, and injunctive or other equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that the Court enter an order:

a.    Certifying the proposed Class as requested herein;

b.    Appointing Plaintiff as Class Representative and undersigned counsel as Class Counsel;

c.    Finding that Defendants engaged in the unlawful conduct as alleged herein;

d.    Enjoining Defendants' conduct and requiring Defendants to implement proper data security policies and practices; specifically:

i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of their businesses in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.    requiring Defendants to delete, destroy, and purge the PII of

Plaintiff and the Class members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and the Class members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Plaintiff's and the Class members' PII;

v.    prohibiting Defendants from maintaining Plaintiff's and the Class members' PII on a cloud-based database;

vi.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendants to audit, test, and train their security

46

personnel regarding any new or modified procedures;

ix.     requiring Defendants to segment data by, among other things,
        creating firewalls and access controls so that if one area of
        Defendants' network is compromised, hackers cannot gain
        access to other portions of Defendants' systems;

x.      requiring Defendants to conduct regular database scanning and
        securing checks;

xi.     requiring Defendants to establish an information security
        training program that includes at least annual information
        security training for all employees, with additional training to be
        provided as appropriate based upon the employees' respective
        responsibilities with handling PII, as well as protecting the PII of
        Plaintiff and the Class members;

xii.    requiring Defendants to routinely and continually conduct
        internal training and education, and on an annual basis to inform
        internal security personnel how to identify and contain a breach
        when it occurs and what to do in response to a breach;

xiii.   requiring Defendants to implement a system of tests to assess its
        respective employees' knowledge of the education programs
        discussed in the preceding subparagraphs, as well as randomly

and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting PII;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers;

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to Class Counsel, and to report any deficiencies with

compliance of the Court's final judgment;

xviii.    requiring Defendants to design, maintain, and test their computer systems to ensure that PII in their possession is adequately secured and protected;

xix.    requiring Defendants to disclose any future data breaches in a timely and accurate manner;

xx.    requiring Defendants to implement multi-factor authentication requirements;

xxi.    requiring Defendants' employees to change their passwords on a timely and regular basis, consistent with best practices; and

xxii.    requiring Defendants to provide lifetime credit monitoring and identity theft repair services to Class members.

e.    Awarding Plaintiff and Class members damages, including statutory damages;

f.    Awarding Plaintiff and Class members pre-judgment and post-judgment interest on all amounts awarded;

g.    Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

h.    Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the proposed Class, hereby demands a trial by jury as to all matters so triable.


Dated: July 8, 2021

**WOLF HALDENSTEIN ADLER  FREEMAN & HERZ LLP**

By,  */s/ Mark C. Rifkin*
MARK C. RIFKIN

MARK C. RIFKIN
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile: 212/545-4677
rifkin@whafh.com

M. ANDERSON BERRY,
*pro hac vice forthcoming*
**CLAYEO C. ARNOLD,
A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
aberry@justice4you.com

RACHELE R. BYRD,
*pro hac vice forthcoming*
BRITTANY N. DEJONG,
*pro hac vice forthcoming*
**WOLF HALDENSTEIN ADLER  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, California
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
dejong@whafh.com

27470